GREEN CROWDER et al. v. JAMES R. SHACKELFORD et al.

1. EXECUTOR AND ADMINISTRATOR : DISTRIBUTION : RIGHT OF DISTRIBUTEE TO HIS SHARE IN ALL THE ASSETS.—A distributee, proceeding under the statute, Hutch. Dig. 665, § 91, to obtain distribution, after the lapse of twelve months from the grant of letters of administration, and before final settlement, is entitled to have his share in all the assets in the administrator's hands distributed to him ; and hence, in such a proceeding, if the petitioner objects to the accounts and in-

ventories of the administrator, on the ground that they do not show all the assets, the Court of Probates may, as on final settlement, investigate the accounts, and charge the administrator with assets not admitted by him.

2. SAME: PROBATE COURT: PRACTICE AND PLEADING: DISTRIBUTION.—It is not necessary, to enable the Court of Probates to investigate the accounts of the administrator, on a proceeding for distribution, and to charge the administrator with assets not admitted by him, that there should be any formal charge of mal-administration in the petition for distribution; but the court may, in ascertaining the amount subject to distribution, order an account, upon the same principles upon which a final account is taken.

3. SAME: SAME: DISTRIBUTION: FINAL SETTLEMENT: COMMISSIONS.—A decree for distribution, made under the statute, Hutch. Dig. 665, § 91, is, in effect, a final settlement of the estate, as between the petitioner and the administrator, so far as the assets then on hand are concerned; and it is proper and right for the court then, to allow the administrator commissions.

4. SAME: POWER OF PROBATE TO REFER ACCOUNTS TO COMMISSIONERS: DISTRIBUTION.—The Court of Probates is authorized by the statute, Hutch. Dig. 663, § 87, to refer the accounts of administrators, executors, &c., to auditors, to restate the same, whenever exceptions have been filed thereto. This statute is merely directory, as to the mode of exercising in a particular case, the general jurisdiction of the court over administrators' accounts; and the appointment of auditors to restate accounts, being thus within the jurisdiction of the court, the parties to a proceeding for distribution, may lawfully consent to their appointment, and a reference to them of the administrator's accounts, with instructions to report the balance subject to distribution.

5. SAME: PROBATE COURT: PRACTICE: MAY REFER ACCOUNTS TO COMMISSIONER WITHOUT INSTRUCTIONS.—The Court of Probates need not first settle the principles, upon which auditors or commissioners appointed to restate the accounts of an administrator, shall proceed. The whole matter may be referred to them, with the power to examine parties and witnesses, but subject to the final revision of the court. (See Hutch. Dig. 663, § 87.)

6. SAME: SAME: ESTOPPEL: COMMISSIONERS APPOINTED AT INSTANCE OF ADMINISTRATOR.—If, at the instance of the administrator, and upon his suggestion that his accounts are incorrect, they be referred to a commissioner, or auditor, appointed to restate them, he cannot afterwards object that the appointment was unauthorized by law, and that an examination of his accounts was then improper, and not warranted by the pleadings, or other circumstances of the case.

7. SAME: REALTY: POWER OF ADMINISTRATOR OVER IT: HEIR MAY WAIVE IRREGULARITIES IN THE EXERCISE OF THE POWER.—As a general rule, an administrator has no control or authority over the freehold estate of his intestate; yet it is subject to the payment of debts, before the actual appropriation of it for that purpose; and the heir may waive his right in it, and a compliance with the conditions prescribed by law, for the regular exercise of the power of the administrator over it, and may consent to his acts, appropriating it to the pay-

Crowder et al. *v.* Shackelford et al.

ment of the ancestor's debts. See *Lee* v. *Gardiner,* 26 Miss. R. 521 ; *Kempe* v. *Pintard,* 32 Ib. 324.

8. SAME : SAME : WHEN ADMINISTRATOR LIABLE TO ACCOUNT FOR RENT.—After an administrator has received the rents of real estate, and accounted for them in his annual accounts, to the Probate Court, as assets of the estate, he is estopped to allege that he received them without authority ; and he will be accountable therefor, as for assets rightfully received ; and especially will this be the case, where his accounts show that he has paid debts of the estate, to an amount equal to the rents received. See *Satterwhite* v. *Littlefield,* 13 S. & M. 302.

9. SAME : ADMINISTRATOR LIABLE FOR SIMPLE INTEREST, WHEN.—An administrator or executor is liable for simple interest, on all sums illegally disbursed by him.

10. SAME : LIABILITY OF ADMINISTRATOR FOR COMPOUND INTEREST.—An administrator, or other trustee, is not permitted to speculate and to make a profit with the trust funds in his hands ; and if he apply them to his own benefit, the *cestui que trust* is entitled to the profits. See *Schiefilin* v. *Stewart,* 1 J. C. R. 620 ; *Ringold* v. *Ringold,* 1 Harr. & Gill. 11–80 ; Harland's Accounts, 5 Rawle, 323.

11. SAME : SAME.—Where the trustee uses the trust funds for his own benefit, and has made, or there is ground to infer that he has made, a profit, the *cestui que trust* may elect to take the profits, or the principal with compound interest. See 1 J. C. R. 620 ; 1 Harr. & Gill. 11–80.

12. SAME : SAME : CASE IN JUDGMENT.—The proof showed, that the administrator, from 1844 to 1855, had cash balances in his hands varying from $1300 to $12,000 ; that in 1849, he refused the application of one of the distributees for a settlement and distribution, and demanded of him money, to assist in carrying on a lawsuit for the estate, saying that he greatly needed money for that purpose ; that in 1852, he drew two bills, for $250 each, to pay attorney's fees, chargeable on the estate, and had them accepted, which bills were payable four months after date, and bore interest, saying that he had no money ; that he complained frequently that he was much troubled to pay the expenses of the said lawsuit, and that he was hard pressed to get money to pay said expenses ; that he paid other attorneys' fees in small sums of $10, $20, and $40, stating, as a reason, that times were hard and money scarce ; that since his appointment he had grown very rich, and had been all the time an active trader, and that he was an unsuccessful planter. Held, that the above facts warranted the conclusion, that he had used the money of the estate in speculating and trading, and that he was liable for compound interest.

13. SAME : NOT ENTITLED TO COUNSEL FEES UNNECESSARILY EXPENDED.—An administrator will not be allowed credit, for money paid to counsel, whose employment was entirely unnecessary, owing to a sufficient number having been previously engaged.

14. PROBATE COURT : PRESUMPTION IN FAVOR OF ITS DECREES : HIGH COURT.— Where the evidence on which the Court of Probates acts, in rendering a decree, is not reported to this court, the decree will be presumed correct. See *Smith* v. *Hurd,* 8 S. & M. 682.

15. SAME: OBJECTIONS NOT MADE IN, NOT NOTICED HERE: HIGH COURT.—Objections, not raised in the Probate Court, on a point in relation to which the facts are not fully stated in the record, will not be noticed in this court.

16. SAME: PRACTICE: MAY RECOMMIT REPORT OF COMMISSIONER.—The Probate may, upon sustaining exceptions to a commissioner's report, recommit it to the commissioner, with instructions to remodel it in accordance with the opinion of the court.

17. SAME: PRESUMPTION IN FAVOR OF ACT OF PROBATE JUDGE.—Where a voucher appears to have been probated before the Probate judge, at a time outside of the regular terms of the court, this court will presume, unless the contrary appears, in favor of the legality of the action of the judge, that a special term was in session at that time, and that the voucher was probated in open court.

18. SAME: WHEN INFORMAL ALLOWANCE OF ANNUAL ACCOUNT CURED.—If the matters of an annual account, which appears not to have been formally allowed, but only to have been "examined and fairly stated," be carried into the subsequent accounts, which were regularly and formally allowed, the informality in the allowance of the first account will be cured.

19. SAME: EVIDENCE: WITNESS: CASE IN JUDGMENT.—If a distributee introduce the administrator as a witness, and attempts, but fails, to establish by him, the invalidity of a voucher, the administrator may be then examined, in his own behalf, to sustain the validity of that voucher.

APPEAL from the Court of Probates of Carroll county.    Hon. W. W. Whitehead, judge.

In September, 1853, James R. Shackelford and wife and others, filed their petition in the court below, against Green Crowder, the administrator, and Mrs. Mary J. Stokes, the widow, and others, the remaining heirs and distributees of James B. Crowder, deceased, who died intestate and childless in 1841.

The petition states that J. B. Crowder left a considerable real and personal estate, and debts due him; that Green Crowder had been administrator since 1842, and that no distribution had been made.    The petitioners tendered a refunding bond, and prayed that distribution might be made to them of their shares in the estate.

The administrator's answer admits that he had sold the personal estate, except the slaves, which were divided between the widow, Mary J. Stokes, and himself, as administrator and acting for the other distributees.

That no other distribution has been made, because at an early

day he was sued for about $15,000, by N. & J. Dick & Co., which suit has ever since been in litigation (about eleven years), and is yet pending, but he now hopes. for a speedy termination of it.    That the estate has also been involved in other suits, both in law and equity.    He sets out the names of the slaves born since his appointment as administrator, and sets up claim to Agga and her children, under a purchase alleged to have been made by him from the widow on the 6th January, 1844, which he says was for a fair and valuable consideration, and refers to a bill of sale therefor, as an exhibit, to her owner, but this exhibit is not in the record.

He admits he has assets, and states that he hopes to be able to bring his administration to a close in a short time, as the litigation which has followed him through his whole administration, and which has heretofore rendered distribution impracticable, or.at least imprudent, is nearly at an end.    He states that none of the distributees have either asked for distribution, or tendered a refunding bond; and he expresses a willingness that distribution shall be made, as soon as he can have a fair settlement of the administration, and a just allowance for his services and expenditures.

In February, 1854, the administrator filed a supplemental answer, in which he stated, that when his original answer was filed, the suit of N. & J. Dick & Co. had been dismissed for want of prosecution, but that afterwards it had been reinstated, and was now on the docket for trial, and was undisposed of.

Mrs. Stokes answered, setting up that dower had been allotted to her in the land in 1842, and that in 1844, one-half of the slaves had been distributed to her as widow, under valid decrees of the court, and she pleads the same in bar of any further division of the property thereby acquired by her.    She also states, that she has been in possession of the property distributed to her since January, 1844, and she relies on that, and the statutes of limitations, in bar of any claim for redistribution.    She states that there are considerable assets in the hands of the administrator, arising from sales of personalty, and other sources, and in which she has not received distribution, and prays that Crowder be compelled to make distribution of the same to her.    The original answers of Green Crowder and Mrs. Stokes, were filed at the December term, 1853.

In February, 1854, the petitioners filed an amended petition, in

which they attack the division made in 1844, to the widow, upon the following grounds.

1. No notice was given to them of said division, and they were not made parties to that proceeding.

2. Said division was not made by commissioners summoned by the sheriff, but by persons appointed by the Court of Probates.

3. The report of said commissioners so appointed, was not made under oath.

4. That it is also void for uncertainty, in not specifying or identifying the slaves set apart to the widow. And it was further alleged that the division was unequal, and unjust as to the heirs.

Green Crowder and Mrs. Stokes are requested to answer and discover the names and description, ages and value, of each of the slaves set apart to the widow, and of each of those retained for the estate.

And the petitioners prayed, that the distribution be set aside, and for nought held, and for a new distribution ; and if this cannot be done, they then prayed that Green Crowder be held accountable for the difference in value in the two lots of slaves.

Green Crowder, in his answer, admitted all the grounds alleged in the petition for setting aside the distribution made to the widow, and that there was considerable inequality in the two lots, the widow's being of the greater value : that is, that the six slaves given to the widow, in addition to her equal share which she has to set off those given by the intestate to Lucy Crowder, were much more valuable than the slaves so given to said Lucy. But he states he is not responsible therefor, as he acted under the orders of the court, and employed counsel, and resisted the whole proceeding.

Mrs. Stokes, in her answer, relies upon the distribution made to her in 1844, and her possession under it as a bar; denies the alleged inequality, and denies most of the grounds upon which it is attacked in the petition.

Mrs. Stokes and Green Crowder both set out a list of the slaves allotted to her, and also of those retained by the estate, and of their value at the time distribution was made, as fixed by the commissioners appointed to make distribution to her.

From this, it appears that Agga was set apart to the widow, valued at $300 ; and it also appears, that the aggregate value, as

assessed by the commissioners, of the slaves allotted to the widow, exceeded the aggregate value of those given to Lucy Crowder, and those left for their heirs, by $600. Wherefore, the widow was required, on said division, to pay one-half thereof ($300) to the administrator, for the heirs.

At the December term, 1853, Green Crowder, the administrator, filed his petition in the court, stating that numerous errors had occurred in his accounts, and asking leave to correct them before distribution is made; and at the February term he filed an additional petition, in which he sets out the various errors, overcharges, &c., of which he complains, amounting in number to twenty or thirty items, which are not necessary to be specified, further than to state, that among them was no objection to the several amounts which he had reported as received for rent of lands.

At the February term, 1854, A. M. Nelson was appointed a commissioner, to ascertain and report to the March term, the exact amount remaining in the hands of Green Crowder for distribution. At the succeeding March term, Nelson made his report, to which exceptions were filed by Crowder; but they do not appear to have been disposed of; and at that term (March, 1854) Nelson was also appointed a commissioner to ascertain the share of Mrs. Stokes in the assets (except slaves) on hand and subject to distribution; but under the appointment he made no report. At the same March term, the cause was submitted, and an interlocutory decree was made.

This decree recites, "that it appeared that the widow, M. J. Stokes, had received her distributive share in the slaves of said estate, amounting to one-half of the same, whereby petitioners are entitled to receive one-sixth of the remainder, now in possession of said Green Crowder, administrator of said J. B. Crowder, and consisting of the following" (here follow the names of the slaves, including Agga, and her two children, George and Esther, born since the division with the widow).

It was, therefore, ordered, that three commissioners—named in the decree—set apart to the petitioners their share in the said slaves.

It was further "ordered, by consent of parties, that said commissioners inquire into and report the value of the hire of

Agga and George and Esther, from 1st January, 1844, to the present time, allowing said Green Crowder a reasonable compensation for raising said George and Esther;" and, it appearing that the petitioners had given refunding bonds, the administrator was ordered to deliver to them their share, when set apart.

The decree further directed, that the administrator was responsible to the heirs for the loss sustained by them, on the division made in 1844 with the widow, and a commissioner was appointed to ascertain such loss; and the commissioner was directed, in ascertaining the value of the respective lots of slaves, to value Agga with the lot left for the heirs.

The decree then proceeds as follows: "As to the money and choses in action belonging to said estate, the court not being informed as to the amount in the hands of said administrator,—the accounts of the administrator having been referred, at his own instance, to a commissioner, whose report has not been made and confirmed,—it is further ordered, that petitioners are entitled to one-sixth part of the money and choses in action accruing from the hire of negroes and rent of land, since dower was allotted in the same to the widow, and to one-twelfth part of the money and choses in action accruing from all other sources."

Directions were also given as to what funds the debts should be charged on; but as there was no contest on this point, it is unnecessary to state them. A. M. Nelson was appointed a commissioner, to ascertain the amount due petitioners by the administrator.

Finally, the decree recites: "It is further ordered, by consent of petitioners and Green Crowder, that said parties shall have notice of the time and place of taking said account; and that all errors, either for or against said administrator, shall be inquired into and corrected before said commissioner, as fully as if a bill of review had been filed, subject to the revision of this court; and that all other questions be reserved until the coming of said report."

At the same term, and after this decree was entered, Green Crowder filed a petition, asking the court to direct the commissioners therein appointed, to set apart to all the heirs their respective shares in the slaves; which was accordingly so ordered.

Afterwards, W. B. Helm was appointed a commissioner, in lieu

of Nelson, to state the account between the parties; and after that appointment, James Somerville, by consent of parties, was appointed a co-commissioner with W. B. Helm.

Under these appointments, and without any further pleadings, the said commissioners, Helm and Somerville, examined witnesses, and restated the accounts of Crowder from the beginning; in some instances making additional charges against him, and in others rejecting items of credit which had theretofore been allowed him. They made their report to the February term, A.D. 1855; to which Crowder and Mrs. Stokes both filed exceptions. Some of the exceptions of Crowder were sustained, and the commissioners were ordered to restate the account, in accordance with that action of the court.

Those portions of the report, as finally affirmed, to which objection was made in this court, are as follows: 1. The commissioners charged Crowder with simple interest on all disbursements made by him, which were adjudged illegal; 2. They charged him with compound interest, at eight per cent., making annual rests, on the cash balances in his hands, from time to time, as they appeared by his annual accounts; 3. They rejected the credits which had been allowed Crowder, for fees paid several attorneys for services in the Circuit Court; and also the fees of two others, for services in this court, in the case of N. & J. Dick & Co., against him as administrator of J. B. Crowder; allowing only the fees of the three counsel originally employed in the Circuit Court, and their fees, and the fee of one other, employed in this court; 4. They rejected the items of credit, for fees paid two attorneys in a suit he instituted against M. J. Stokes, in the Circuit Court, allowing only the fee of the original counsel employed therein; 5. They charged him with the various amounts which he had reported in his annual accounts, as received by him for rent of land.

The evidence taken before the commissioners, Helm and Somerville, was reduced to writing, and returned to the court, with their report, and is copied in the record. There were several bills of exceptions taken during the progress of the trial in the Circuit Court, on the final hearing, to the rulings of the court in relation to the exclusion or admission of evidence offered; but it is unnecessary to notice any of them, further than is stated in the opinion of the

court. None of the evidence before the court, on the rendition of the interlocutory decree, at the March term, 1854, appears in the record.

The evidence in relation to the charge of compound interest is as follows: It was shown, that from 1835 to 1841, Crowder was a small planter, working from ten to fifteen hands, and owning from twenty to twenty-five slaves; that his annual crops, during that period, were from seventy-five to one hundred bales; that he was an unsuccessful farmer, generally buying his corn and meat, but that he succeeded very well in raising young negroes; that since 1841, he has made an "immense estate," now owns eighty or ninety slaves, and works forty or fifty hands, and has town property worth $25,000; and that Crowder has been extensively engaged in trading in lands, and that he was a successful and shrewd trader; and it was shown by Crowder, that he received a legacy of $3000, since 1841, and that he purchased about twelve of the slaves acquired, since that time, by the sale of land owned by him.

It was also shown by petitioners, that during the whole period from 1841 to the present time, that there was no difficulty in loaning to good and solvent men, from $15,000 to $25,000, at eight per cent. interest; and in answer to this, Crowder showed, by two witnesses, that about 1850, he offered to loan them money at eight per cent., and they declined to take it.

Crowder's annual account showed the cash balances in his hands as follows: in 1844, it was $1294; in 1845, $4514; in 1846, $6196; in 1847, $7010; in 1848, $7233; in 1849, $8727; in 1850, $10,803; and from that time to 1855, the cash balances ranged from $10,000 to $12,000.

It was proven by a witness who was a near neighbor of Crowder, and who frequently hired the negroes of the estate from him, that Crowder frequently, during the course of his administration, complained of having a difficulty in obtaining funds enough to carry on the Dick & Co. suit.

C. E. Penn proved that he was a brother and agent of Mrs. Stokes, and that in 1849 and 1850, Crowder told the widow that he wanted some money, to aid in paying the expenses of the Dick & Co. suit; that she ought to assist him, as he was at considerable

expense, and greatly needed money to pay said expenses, and could not get along without it.

Crowder had employed John J. Guion and A. Burwell to attend to the Dick & Co. suit in this court, and received credit, in his annual accounts, for two items of $250 each, paid these counsel; and it was proven by R. Coffman, that in November, 1852, he, as a member of the firm of McRae, Coffman & Co., of New Orleans, accepted Crowder's bills in favor of each of these counsel, payable at four months, and for $250 each, with the interest added; and at the time Crowder applied to this witness to accept these bills, he stated to the witness, that Guion and Burwell "wanted their fees, and that he did not have the money to pay them, and he wished therefore to draw bills to pay them, and meet them with his cotton." This transaction took place in Grenada, near which place Crowder lived; and this witness further stated, that sight checks for the above amounts, on New Orleans, could at that time have easily been procured in Grenada. Crowder proved by A. Burwell, that he (Burwell) wrote to Crowder to send him a bill on New Orleans, for his fee, and that he was satisfied with the one sent by Crowder.

Richard Nelson testified, for petitioners, that Green Crowder employed him as attorney, to institute three suits for him, as administrator, against Mrs. Stokes, on notes held by him against her, and to attend to his (Crowder's) final settlement in the Probate Court, at the sum of $150, for which he gave me his notes on time,—one for $100, and one for $50. Finding that six suits had to be instituted on these notes (owing to the death of Mrs. Stokes's sureties), the agreement as to the amount of the fee was rescinded. Two receipts, for $150 each, had been given by witness to Crowder, on account of services rendered the estate, and they were allowed in his accounts. He does not recollect whether these receipts were intended to cover any services rendered by him to Crowder, other than for the estate. Witness always gave the receipts in the form Crowder desired. "The last receipt, for $150, covers several previous payments made at different times, for services in the suits against Mrs. Stokes, I neither demanding, nor the peculiar circumstances of Crowder permitting, the payment of the whole fee at one time." On being asked to explain what he meant by the phrase "the peculiar circumstances of Crowder not permitting the

payment of the whole," witness said, "I knew he was hard pressed, having to pay the expenses of the N. and J. Dick suit."

Upon a re-examination (made 3d March, 1855), this witness stated that the sum of $182.20 in the annual account of Crowder, of 1855, paid witness, and $150 in the account of 1851, and $150 in the account of 1854, and claimed as credits by Crowder, "were not paid on any specific claim, for specific services, but on general account, for legal services rendered to Crowder in the Dick & Co. suit, and the suits against Mrs. Stokes, and in the cases of Messrs. Stokes and Shackelford (the present suit) in the Probate Court — having been retained by Crowder in all his litigation in this county;" and that there was no other contract, as to fees, between him and Crowder, except that mentioned in his first examination: that he always gave the receipts, as to the case in which the payment was made, as Crowder requested; expecting, on final settlement, that the matter would be adjusted, and the proper amounts be charged to the estate, and Crowder individually. Witness is still the counsel of Crowder, and conducting this suit for him.

Thomas H. Clark stated, he is attorney for Crowder in this suit, and in the N. and J. Dick suit, and the suits against Mrs. Stokes. In making payments to me, Crowder, "would pay $10, $20, or $40, as he could spare it, he (C.) complaining that the times were hard, and money scarce." Crowder owes witness for fees in the Dick & Co. and M. J. Stokes suits, about $800, which have been due over a year. The reason witness has not demanded from Crowder the payment of this sum is, "that I intended to call on him for the whole amount, when this litigation should be ended, and also, that I knew that Crowder's expenses were heavy, and that he would have large amounts to pay, and he complained of hard times, which induced me to believe that it would not be convenient to pay it."

Witness was first employed by Crowder in 1851, or 1852.

The substance of the evidence, in relation to the attorneys' fees rejected in the Dick & Co. suit, is stated in the opinion of the court. In relation to fees rejected in the cases against Mrs. Stokes, in addition to what is hereinbefore set out in the abstract of the testimony of R. Nelson, it is necessary to state, that Crowder held three notes on Mrs. Stokes, amounting to about $5000, and payable to him as

administrator, the consideration being purchases made by her at a sale of the perishable property belonging to the intestate. Suits were instituted on these, and judgments recovered. Mrs. Stokes enjoined the collection of the judgments until her share in the estate could be ascertained, and she sought to have said share credited on the same.

C. E. Penn proves, that before suits were instituted on these notes, he, as agent of Mrs. Stokes, proposed to Crowder to ascertain what would be due her in his hands as administrator, and to pay any balance that might remain, after the share of Mrs. S. was deducted; but this was declined by Crowder.

The proceedings in the court below, so far as they relate to the exceptions taken by Mrs. Stokes to them, are sufficiently stated in the opinion of the court.

The final decree, confirming the commissioners' report as remodelled, allowed Crowder commissions on the whole assets which came to his hands, both before and after the distribution to Mrs. Stokes, and one-half thereof was charged to her. The administrator was charged with three-fourths of the costs, to be paid by him out of his own funds, and one-fourth out of the assets in his hands.

From this decree both Green Crowder and Mrs. Stokes appealed.

*F. Anderson*, for Green Crowder.

I have endeavored above, to give a brief and condensed statement of the proceedings in the cause, and believe that the court, by referring to the various pages indicated, will save itself much trouble in examining the whole record.

1st. It will be seen that the account reported by Somerville and Helm, on which the final decree was based, charges the administrator with simple and compound interest, on the various balances in his hands since 1842.

2d. It will be seen that the same account, charges the administrator with the rent of all the lands of the estate, up to the allotment of dower in the same, in 1842, and of one-half of the land from that time.

3d. That, in the same report, various items of credit claimed by

the administrator were excluded, to which I will hereafter ask attention.

4th. That the slave Agga, and her children, were distributed to the heirs, although she had been previously distributed to Mrs. Stokes, and that the administrator was held accountable for their hires, &c.

5th. That said account and report are made (if under any authority whatever) under the authority of the decree made at the March term, 1854; for Somerville and Helm were only substituted instead of Nelson, appointed in that decree, to ascertain the distributive shares of petitioners.

6th. That the decree last alluded to declared no basis, and announced no principles upon which the account was to be taken, as against the administrator, except that it required the administrator to be charged with the rents of the land, as well as the hire of the negroes.

The last observation is important, because it might be said, that it is too late for the administrator to object to his being charged with rents, as he made no exception to the report on that ground. If he had made exception, on that ground, to the report, it could not have availed him, because the decree, under which the commissioners acted, required them to charge him with rent. The error is in the decree, to which he excepted, and not in the report.

I insist that the whole proceedings were erroneous; that under the pleadings in the cause, and the attitude of the case, it was not competent for the court, either by itself, or through the instrmentality of commissioners, to enter into an investigation of the accounts of the administrator.

The proceeding being under the 91st section of the Act of 1821, all the court could legally do was, "to make a rule on the administrator to make distribution agreeably to law." Hutch. Code, 665, § 91.

The court could not, under this proceeding, settle the accounts of the administrator, and such settlement is not binding on any party.

The only mode in which his accounts can be definitely and conclusively settled, has been pointed out by law. If it be an annual settlement, the 87th section of the Act of 1821, if a final settle-

ment, the 12th section of the Act of 1846, provides the mode. Hutch. Code, p. 663, § 87; Ib. 682, § 12.

But even admitting the power of the court, under a proceeding for distribution, to investigate and settle the accounts of an administrator, on a proper case made by the pleadings, and to hold the administrator liable for assets, not admitted in his accounts, still it was erroneous, under the pleadings in this case, to enter into any such investigation. No charge was made of mal-administration. No allegation that he should account for any assets, either in the shape of principal or interest, not admitted in his accounts,—and it may be here remarked, that he had regularly returned his accounts once, and even twice a year, and no exception was ever made to them, so far as we can see, until the commissioners came to make out their report. And it was, therefore, clearly incompetent to enter upon an examination of those accounts under the proceedings in this cause.

In my opinion, the only mode by which innumerable difficulties may be avoided, under the Act of 1821, is to pursue its letter and its spirit. When a party applies for distribution, and tenders a refunding bond, if the administrator admits assets, as in this case, let a rule be made upon him to distribute. If he does not admit assets, it might be admitted that the inquiry could be made whether he had assets, but surely not to charge him with assets when no charge of assets, not admitted by him, is made.

This was not a final settlement, and is not binding, as such, on anybody. Parties have now a right to cite Crowder to a final settlement, and then this whole proceeding may be set aside, and certainly would be disregarded, in favor of any one interested, not having actual notice of the proceeding, and being a party to it.

The argument, made by the counsel for Mrs. Stokes, on this appeal, illustrates the correctness of my position. He objects to the sum of $4033, commissions allowed to the administrator, because, he says, that he is not entitled to it, until a final settlement, and sustains himself by reference to the statute, and the decisions of the court. What is the result? An administrator, without being charged with improper conduct, no objections ever having been made to his return, no refunding bond ever having been tendered, and no demand ever having been made upon him for distribution, is brought

into court, forced, without any allegations against him, to submit to a censorious examination of the proceedings honestly and laboriously conducted by him, is compelled to part with every dollar of assets in his hands, and because he cannot make a final settlement, on account of a large suit like that of N. & J. Dick & Co. hanging over him, is forced to pay to the distributees the last farthing, and this is cut out of the commissions which the statute allows him, or, if he can, to recover them in an action at law against the distributees.

The plain construction of the statute· is, that the legislature never intended, on this summary proceeding, to do more than require the administrator to distribute such assets as his accounts showed against him, and to leave the parties to their remedy of forcing him to a final settlement for any ulterior rights.

I insist, in the next place, that the report of the commissioners, on which the decree was based, was a proceeding without the authority of law.

That account, as I have shown, was taken under the authority of the decree made at the March term, 1854. It will be seen that it was not a reference, as in a Court of Chancery, to state an account on certain principles, declared by the court, but that so far as the contest between the administrator and distributees was concerned, it was an absolute transfer of the whole jurisdiction, both as to law and to fact, with power to examine evidence (according to such rule, I suppose, as the commissioners might think the law presented), the only exception or limitation on their power being that, in their report, they were to embrace the difference between the value of the negroes allotted to Mrs. Stokes, and the remainder, and that Agga and her children should be valued in the remainder, and that they were required to charge the administrator with rents of land. Thus transferring, in fact, to the commissioners, the jurisdiction of the court on the most important questions involved in the controversy. Such a proceeding would be erroneous in a Court of Chancery, but the Probate Court has not even the powers of a Court of Chancery, in this respect.

Its powers are defined by statute, and the only cases in which it may appoint auditors or commissioners to act for it, are declared by statute. Hutch. Code, 663, sect. 87, Act of 1821; sect. 103; Act of 1821; Insolvency, 667; also B. 682, §§ 12–14.

Crowder et al. *v.* Shackelford et al.

The case under consideration is not embraced in either of the acts alluded to; and as the court had no power to authorize evidence to be taken by such commissioners or auditors, except in the above cases, or in cases provided for by law, all the evidence taken in this was extrajudicial, and not before the court when it decided the questions.

If it is urged, that though the court had no power to appoint the commissioners, yet that its judgment must stand as the judgment of the court, without reference to the report, I say in reply, that if the court had no power to act, then the court had no evidence before it, except the annual settlements of the administrator; and in that view, the final decree is most clearly erroneous.

It is true that the decree of the court may be correct, notwithstanding the appointment and report of the commissioners; but if the commissioners had no power, then the decree of the court must stand upon the evidence in the record, and not on their report, without which, there is no evidence but the annual settlements of the administrator.

If these reports, on the other hand, are to be taken as reports in the Chancery Court, and to stand until excepted to, and exceptions sustained, then the whole proceeding based upon the reports of Somerville and Helm, were erroneous; as Nelson had previously, under the appointment of the Court, made reports; and his reports, though excepted to, were never set aside.

If, again, the report is not to be taken, as in chancery cases, as valid until not excepted to, but simply as a means adopted by the court to inform itself, both as to law and fact, then a consequence. follows, on which I insist, and that is, that I am entitled to all objections, whether exceptions were taken or not; and that whatever will be a valid objection to the decree, will avail me now, notwithstanding it may not have been embraced in the exceptions to the report.

The objections which I make, then, are as follows:—

1st. The error in charging the administrator with rents of land.

2d. Charging him with simple and compound interest.

3d. The exclusion or rejection of certain credits, particularly fees paid to lawyers.

4th. The distribution of Agga and her children to the heirs,—

she having been distributed to Mrs. Stokes, and that distribution not being set aside.

5th. The charging the administrator with the hires of Agga and her children, and with $300, which he gave Mrs. Stokes for her title, and with which he is charged in his accounts; he in fact having charged himself with that amount, as paid by Mrs. Stokes to him, on the difference in value of the slaves received by him, and the slaves reserved for the heirs.

I will briefly discuss these points, in their order.

1st. It was clearly erroneous to charge him with rents; and I have shown that this was an error in the March term, 1854, and that an exception to the report was not necessary. The error pervades the whole account, from 1842 to 1855. *Carmichael* v. *Browder*, 3 How. 257; *Davis* v. *Roberts*, 1 Sm. & M. Chan. Rep. 543; North on Probates, 178; *Cole* v. *Leake*, 5 Cush. 770; 3 Cush. 252; *Jones* v. *Coon*, 5 S. & M. 767.

2d. The charging of simple and compound interest, amounting to $10,355.15.

This was made an exception to the reports, and would be available against the decree, if it had not been made the ground of exception.

The general proposition is, of course, not disputed, that an administrator may be charged with interest, when he converts the money to his own use, and employs it in his own business. And the attempt is made, by the evidence taken before the commissioners, to show that Crowder did so; but I think I may say that there was an utter failure to make the proof. The chief ground relied on is, that Crowder had made a large estate; but, without reviewing the proof, it is established, that in 1834, eight years before the death of James B. Crowder, he had been the purchaser of a considerable property, both in lands and slaves; that he had a large amount of land, a great deal of which he had traded for negroes; that his property has greatly risen in value; that he received a legacy of $4000; and that he was a remarkably shrewd trader, and an economical man. By these means his estate increased, from 1835 to 1854,—nineteen years,—from a plantation and some fifteen hands, to a plantation and some forty or fifty hands; certainly no wonderful result, without attributing to him the money of the estate.

Again : it is said on the evidence of Coffman, that in 1852 or 1853 he had no money, because he gave a draft to Guion and Burwell, in the N. & J. Dick case; but Pool and Burwell will both prove, that he gave the draft because Burwell preferred it, and because it was convenient, not for the want of money.

It is also contended, that in 1853, from the depositions of Nelson and Clark, Crowder did not have money, and, therefore, must have used the money of the estate. But these depositions both show, that neither of them ever urged Crowder for any amount of money, without getting it; and besides, they only establish that, as Crowder had been at great expense in the Dick suit, they did not wish to force him, but not that he did not have any amount of money at command. This is the substance of the proof to show that he had converted the trust fund.

On the contrary, the record is full of proof that Crowder was an economical, shrewd, calculating, and a trading man, who started with a large capital in 1834, and has had several large accessions to his capital since then; that he had always money, when called on ; that he rendered, with exemplary punctuality, his accounts once or twice a year ; that he was never called upon to distribute, because the heirs knew it was to their interest not to have the estate distributed, until the settlement of the Dick suit..

Now, what is the principle upon which an administrator is charged with interest.

This court has said, more than once, that if he convert the funds, or if he delay accounting, or if, after twelve months, without some reasonable excuse, he retain money without putting it out at interest, or without distributing it, he ought to pay interest, but in no case compound interest, as in this case. *Keith* v. *Vaden,* 4 Cushman, 131 ; *Cole* v. *Leake,* 5 Cushman, 767 ; *Satterwhite* v. *Satterfield,* 13 S. & M. 302 ; *Kerr* v. *Laird,* 5 Cushman, 544 ; *Sanders* v. *Platner,* 1 Cushman, 573; see also the case in 10 Yerger's Rep. 163.

In none of the cases referred to has the administrator been held accountable for interest, except in cases of negligence and unnecessary delay in accounting, and then only for simple interest.

The ground on which interest is allowed, is the " conversion of the fund," or " negligence in keeping it for a long time without

cause ;" and in the latter case, not because it is his duty to " make it profitable," but because it is his duty to distribute.   2 Will. on Executors, 1131, 1132, part 4, B. 2, ch. 2, § 2 ; 1 John Chan. Rep. 620 ; North on Probates, 167 ; *Satterfield* v. *Littlefield*, 13 Sm. & M. 302.

3d.  The refusal to allow the following items of credit :—

| | |
|---|---:|
| Fifty dollars paid to Nelson, fee for resisting the widow's application for dower in slaves, . . . . . . . . . . . | $50.00 |
| Amount paid Caldwell in 1848, or '49, . . . . . . | 50.00 |
| Amount of Caldwell's fee in Dick & Hill case, . . . . . | 300.00 |
| Amount of Guion and Baine's fee, . . . . . . . | 250.00 |
| Amount of J. E. Sharkey's fee, . . . . . . . . | 250.00 |
| Amount paid Nelson for professional services, in 1851, . . . | 150.00 |
| Amount of Burwell's fee, in Dick & Hill case, . . . . . | 252.25 |
| Amount of Guion's fee, in same case, . . . . . . . | 250.00 |
| Amount of J. S. Johnson's fee, in the case of *Crowder* v. *M. J Stokes*, | 50.00 |
| Amount paid Col. Nelson on account, 1854, . . . . . | 150.00 |
| Caldwell, in Dick & Hill case, . . . . . . . . | 100.00 |
| Amount claimed for Agga, . . . . . . . . . | 300.00 |

Of the above items, I think it will be seen that every one of them should have been allowed.  Some $1400, in the Dick & Hill case, had been disallowed, on the ground that Acee, and Shepherd, and Cothran, had been employed in that case ; but Sheppard was employed by Mr. Stokes, and was not the counsel of Crowder. Suppose $1000 was paid to Acee, Cothran, and Baine ; then the above $1400 would make $2400 paid for a case involving $9000, with interest at 10 per cent. since 1842, and litigated in the courts for twelve years, there being a verdict, at one time, for $1600, or thereabouts, not an unreasonable amount.  The same may be said of the other lawyers' fees; they were excluded without any sufficient reason.

4th and 5th.  The last ground of error to which I shall ask the attention of the court, is the action of the court below as to Agga, and her children, George and Esther.  Agga was allotted to Mrs. Stokes (see her answer to amended petition); but yet, in the decree of March, 1854, the foundation of all subsequent proceedings, she was placed among the slaves to be distributed to the heirs, without any pretence whatever, and that although the admi-

nistrator had charged himself with $300, the amount which Mrs. Stokes owed the heirs, and in consideration therefor received from her Agga.

He was also held accountable for the hire of Agga, all of which was erroneous.

But it may be asserted that the administrator purchased Agga with the funds of the estate, and therefore the heirs are entitled to Agga, and her hires. ˙ To this I answer, 1st, it is not true — there is no proof of it; 2d, if true, the heirs elected to hold Crowder liable for interest, for dealing, as they charge, in the trust funds, and under those circumstances they cannot also demand the profits. The rule is, that they "must elect to take either the profits for the whole period, or the interest for the whole period." North on Prob. 167; 2 Will. on Executors, 1134.

*J. S. Johnson,* on same side.

*E. L. Acee,* for Mrs. Stokes.

1. The Probate Court can allow commissions only on final settlement. *Merrell* v. *Moore,* 7 How. 271; *Shurtliff* v. *Witherspoon,* 1 S. & M. 613.

2. Mrs. Stokes ought only to have been charged one-half of the commissions accruing on the assets received, up to the division made in 1844; she had no interest in the assets received since then, and ought not to pay commissions on them.

3. The court should not have allowed the exceptions to Crowder, to any of the attorney's fees rejected by the commissioners. The proof showed clearly that they were unnecessary.

4. The exceptions of Mrs. Stokes to the allowances of the credit in the account of 1842, for the amount paid Brown, should have been sustained. 1st. Because it appears that the vouchers, on which the credit was allowed, were probated on the 22d July, and not during a term of the court, which is on the first Monday of each month. And 2d. The annual account itself was not allowed: it is indorsed simply, "Examined and fairly and stated," and this is insufficient. *Keen* v. *Keen,* 25 Miss. Rep. 513.

*J. Z. George,* for appellees, Shackelford et al.

I. It is now insisted, that the proceedings in the court below, could not legally have taken place under the pleadings. And 1st. It is said that in a proceeding for distribution, that the only order or decree the court can render, is to grant a rule on the administrator to make distribution according to law, and that it is not competent then to inquire into the administrator's accounts, and ascertain what is really due and subject to distribution. 2d. If this could be done, then it is said, that there is no allegation in the petition authorizing these proceedings. And 3d. That the appointment of the commissioners was unauthorized.

1. The statute says, that the court shall grant a rule on the administrator to make distribution according to law. This does not leave it to the discretion of the administrator to distribute, what he pleases to regard as assets of the estate; if so, the remedy given by it would be most lame and ineffectual. There is no other statute authorizing a proceeding for distribution, and if this does not authorize the heir or distributee to get what belongs to him in the estate, then there is no remedy, but he must accept what the administrator pleases to give. The statute then must mean, that the court shall ascertain what specific property, or slaves, or what assets there are in the administrator's hands subject to distribution. This is most clearly so, with reference to slaves, for in that case commissioners are appointed to divide or distribute them, and the administrator is charged with no duty respecting them, but to deliver them when divided to the proper parties. This same statute applies as well to distribution of slaves, as money, and if in the one case, it be clear that the court must first ascertain the fund or property to distribute, it may do so in the other; and if it can ascertain the fund subject to distribution, it certainly is not confined to the admissions of the administrator in his accounts, but may take appropriate steps to ascertain whether his account be correct or not; and this is the established practice. See *Jones* v. *Coon,* 5 S. & M. 751; *Standley & Harlin* v. *Langley,* 3 Cushm. 252; *Cole* v. *Leak,* 31 Miss. Rep. 131.

2. The second objection urged on this branch of the case is, that if it were competent on a proceeding for distribution, to inquire into the accounts of the administrator and hold him liable for assets not admitted by him, that then the pleadings did not authorize this to be done in this cause, inasmuch as there was no suggestion or allega-

tion in the petition, that the administrator's accounts did not show the true balance in his hands. To this I answer, 1st. That Crowder himself admitted his accounts to be incorrect, and filed a petition asking to have them corrected. And 2d. That the parties waived the necessity of pleadings, by their agreement contained in the interlocutory decree, that the commissioners should inquire into all errors in the accounts, both for and against the administrator, and correct them.

3. The statute expressly authorizes the Court of Probates, to refer administrators' accounts, when excepted to, to auditors, who are required to examine and restate the accounts so referred (Hutch. Dig. p. 663, Art. 87), and this practice has been sanctioned by this court. See *Smith* v. *Hurd*, 8 S. & M. 682 ; *Satterwhite* v. *Littlefield*, 13 S. & M. 306 ; *Bennoit* v. *Brill*, 2 Cushm. 85. But it is said that this is not the case specified in the statute, in which auditors or commissioners are to be appointed. This is true, but I have proven by the statute, that it is within the power and jurisdiction of the court to make the appointment, and if so, the appointment is not void ; and whether the state of facts exist or not, in which the statute contemplates the appointment of auditors, is immaterial, since it was competent for the parties to waive their existence ; and this they have expressly done in the interlocutory decree. It is true, that the parties could not confer a power on the court, which the law does not permit it to exercise under any circumstance ; but they certainly could consent that the court might exercise a known statutory power, under circumstances not mentioned in the statute ;— they could waive the existence of the facts which would authorize the court to exercise the power without their consent.

But it is insisted that the court gave no instructions to the commissioners, as to the principles on which they should state the account ; and that it referred its whole jurisdiction over the matter to them, and that this was an unconstitutional transfer of the powers of the court, to an illegal body. To this I answer : 1st. The statute authorizing their appointment does not require that instructions shall be given to them (Hutch. Dig. Ib.); and if it were required, the subsequent ratification of the report by the court, would remove this objection. But it is further said, that the appointment of the commissioners being void, their report of the

evidence taken before them is void; and that it follows, that there
was no evidence before the court but the annual accounts of the
administrator, and that the decree is thus shown to be erroneous.
To this I answer, that I admit that the evidence taken before the
commissioners is not legally before this court, for want of proper
authentication; but it does not follow that it may not have been
properly before the court below. For, however illegal it may have
been as to the persons who took it, still it might have been intro-
duced to, and considered by the court, unless objected to there.
*Neely* v. *Planters' Bank*, 4 S. & M. 113; *Sessions* v. *Reynolds*,
7 Ib. 730; *Doe* v. *Natchez Insurance Company*, 8 Ib. 197. And,
moreover, the bills of exceptions taken, show that evidence was
before the court on the final trial; and wherever the action of the
court is based on evidence, and that evidence is not reported to
this court, the judgment will be presumed correct, and affirmed.
*Smith* v. *Hurd*, 8 S. & M. 682. It is again said, in opposition to the
power of the court to appoint the commissioners, that it could not
legally do so, until the report made by Nelson, at the March term,
1858, had been disposed of; but this objection is expressly held
untenable by *Satterwhite* v. *Littlefield*, before cited.

II. It is next insisted, that the court had no jurisdiction to charge
Crowder for rent of land received by him. To this it is answered,
that, in the first place, it nowhere appears that this land was free-
hold,—it may have been leasehold property; and, in that event, it
was assets, and the administrator was chargeable; and if necessary
to uphold the decree, it will be presumed leasehold, as every pre-
sumption must be indulged to support the decree.

But if the land be regarded as freehold, still, under the circum-
stances of this case, the charge for rent was proper. The adminis-
trator had voluntarily returned the rents as charges in his annual
accounts, and the commissioners, following the interlocutory decree,
merely transferred to the account stated by them, the items in
Crowder's own accounts; he made no objection to the charge,
neither in his petition filed before the interlocutory decree, in which
he undertook to specify all the erroneous charges against him, nor
after the commissioners made their report. It was never suggested
anywhere in the court below, that he was unwilling to be bound by
these charges, thus voluntarily made. After receiving the rents

for over ten years, and professing to account for them in his trustee capacity, it would be monstrous now, after the claim against him in every other capacity is barred by the Statute of Limitations, to permit him to raise the objection now insisted on.

Again, the rents belonged to the distributees, and they had the right to advance them, or any other money belonging to them, for the payment of debts, so as to protect the specific property. Here they permit the administrator to collect and receive the rent, he charges the amount so received on the debtor side of his account, and on the other side he claims credit for debts paid, to an amount exceeding ten times the rent: this is an application of the rents to the payment of debts, with the consent of the heirs; it is nothing more in substance than an advance by them for the payment of debts, and surely in such a case the administrator as against them, would not be entitled to credit for payments made with their own money. By crediting him with the debts paid, and charging him with the amount advanced, the same result is arrived at, as if both items were stricken out.

Again, he was allowed over $4000 for commissions. This is a much larger amount than the rents, and is a debt due by the heirs; it was certainly competent for them to set off their claim for rent, against his claims for commissions.

There is another conclusive answer to this objection to the jurisdiction of the court to charge him with the rents: the Court of Probates has jurisdiction to condemn land for the payment of debts, in two cases. 1st. Where there is an insufficiency of personalty; and 2d. Where it is to the interest of the heirs to so apply it in preference to slaves. It is then a matter, under certain circumstances, within the jurisdiction of the court. Now, it is well settled that if the court, in the exercise of this jurisdiction, fail to observe the law, as to notice to the heirs, &c., that the judgment of condemnation is void, and the sale is also void; yet it is equally well settled (*Lee* v. *Gardner*, 26 Miss. R. 521) that the heir may waive this irregularity, and may confirm this void act. He may thus waive the existence of the legal state of facts which gives the court jurisdiction; if he may do so as to the land itself, it seems clear that he can do so as to the rents: for a void attempt to do a thing, can have no more efficacy than if no such attempt had been

made. Here the heirs waive the want of power in the administrator to apply the realty, *i. e.*, its rents, to the payment of debts; they affirm his unauthorized acts, and the administrator is bound under the authority of *Lee* v. *Gardner*, *supra*.

Again, the administrator may voluntarily charge himself with assets, not within the jurisdiction of the court, and over which the grant of letters to him gave him no control. The grant of letters here gives the administrator no power over assets in another State, because such assets are not within the jurisdiction of the court; yet if the administrator voluntarily bring such assets within the State, and charge himself therewith in his accounts, he is responsible. *Satterwhite* v. *Littlefield*, 13 S. & M. 304, 305. And the same rule has been applied to a guardian. *Stevens* v. *Martin*, 30 Miss. R. 160. The analogy between these cases and the point now under consideration is complete.

III. As to Agga and her children : the evidence before the court when the interlocutory decree of March, 1854, was rendered, is not reported to this court; it does not appear by the record that Agga was set apart to the widow,—the report of the commissioners to make the division failing to specify the negroes; it was hence a matter depending on proof, to determine to whom she was allotted, and the evidence not being reported, the presumption is that the decree is correct. *Smith* v. *Hurd*, 8 S. & M. *supra*. Moreover, there is a distinct recognition, by Crowder, of the heirs' title to her in the decree, when he consents that the commissioners shall value her hire.

If the court considers that the answers of Green Crowder and Mrs. Stokes contain all the evidence that was before the court, at the March term, A.D. 1854, when Agga and her children were ordered to be distributed, even then the decree must be sustained. For, 1st, the decision was void, because not made by the sheriff and five freeholders; 2d, it was void, for uncertainty in not specifying the names of the negroes; and 3d, it was void, as to Agga, because she was valued at $300, and assigned to Mrs. Stokes, whereby she received slaves exceeding in value the slaves of the heirs by $600, and was consequently to pay them one-half that amount, that is, $300, which was the exact value of Agga.

If Agga had been assigned to the heirs, the two lots of slaves

would have been exactly equal. It is hence manifest, that, under the color of a division of the slaves, the commissioners, after having given to the widow one-half of the value of the slaves, sold Agga to her for $300. The administrator retained Agga, and credited Mrs. Stokes with the $300, thus making the division equal; this was but rectifying the error of the commissioners. And although Crowder and the widow attempted to make this exchange for the benefit of Crowder, by a sale of Agga to him, yet, inasmuch as she got no title, she could convey none to Crowder; the title remained in the administrator for the heirs, and inasmuch as the possession remained with the administrator, he would be considered as holding her, in his character as administrator, in which he had title to her, and not in his character as purchaser from Mrs. Crowder, in which he had no title.

But it is insisted that the court confirmed the distribution so made to the widow — we have not appealed therefrom, and hence Agga must be regarded as having been regularly distributed to her. No such decree was ever rendered. This question was disposed of in the interlocutory decree of March, 1854, by which Mrs. Stokes was permitted to retain those in her possession, and Green Crowder was directed to distribute the slaves, including Agga, in his possession. That decree then only confirmed the distribution, which had been illegally made to Mrs. Stokes, to the extent of allowing her to retain possession of those slaves she then held, and disaffirmed it, so far as Agga was concerned. Allowing her to retain, under a void act of distribution, slaves of equal value to those remaining in possession of the administrator, and disaffirming the distribution, so far as it relates to a slave illegally set apart to her, but still remaining with the administrator, cannot certainly be held to conclude us, so as to bind us by a void act, any further than it was thus affirmed.

But it is said by Mr. Anderson, that whilst Agga and her children are directed to be distributed to the heirs, Green Crowder is charged with her value, $300, being the amount returned by him as received from Mrs. Stokes, for the excess in value of her share of the slaves. This is a mistake. It is true that Crowder did charge himself with the $300, but he is expressly exempted from the charge in the final account.

And, further, no objection was made to this action of the commissioners, and to their charging Crowder with her hires, in the court below.

IV. As to the lawyers' fees rejected.

The proof shows clearly that the services of the lawyers whose fees were rejected, were unnecessary, and that their employment was reckless, if not fraudulent.   It further appears, from the testimony of Clark and Nelson, that their retainer in the N. & J. Dick suit, and in the suits against Mrs. Stokes, were merely colorable, for the purpose of getting their services in the Probate Court, about his private business, and in the defence of this suit, so as to charge their fees on the estate, and not on his own purse.   He employed Nelson at $150, to attend to his private business, and the Dick & Stokes suits.   He reserved the trade, pays him, thus far, $482, and charges every dollar to the estate.

V. As to the interest charged.

That the administrator is liable for simple *interest*, on illegal disbursements, is well settled.   *Jones* v. *Ward*, 10 Yerg. 163; cited and approved in *Smith* v. *Hurd*, 8 S. & M. 682.

It is equally clear that he is liable for compound interest, on the cash balances in his hands, under the circumstances of this case.

A trustee is not permitted to make a profit out of the trust estate committed to his charge.   He cannot use the trust funds for his own use, and thus put it at hazard, and if he do, he is liable for compound interest.   See *Schebberlin* v. *Stewart*, where the whole doctrine is learnedly and elaborately discussed by Chancellor Kent, and all the English authorities cited and examined; 1 John's C. R. 620; see also *Peacock* v. *Redding*, 5 Ves. J. 58; 2 Kent's Com. 229, 230, and 231, note E; *Gully* v. *Dunlap*, 2 Cushm. 411–12; 1 McCord Ch. R. 399; 4 Hen. & Munf. 416.

And the *cestui que trust* may elect to take the profits or compound interest.   *Gully* v. *Dunlap*, before cited.   These authorities conclusively settle that we are entitled to compound interest, if Crowder used the money.   If evidence when on the record be not properly before the court, their charge will be presumed to be correct.   1 J. C. R. 620.   If that be examined, it conclusively establishes our position.

He, Crowder, was appointed administrator in 1841.   He was a

small planter from 1835 to that time, working from ten to fifteen hands; and since his appointment as administrator of J. B. C. he has made an immense estate. (G. Williamson's testimony.) He has eighty-five or ninety negroes. He is a poor farmer. (Ib.) That he has got rich is certain. Did he use the money of the estate? He was an extensive trader. (See Williamson's, Brown's, and Brister's depositions.) That he had opportunity to use the money. (See Ayes's, Sanders's, Hart's, and McCracken's depositions.)

That he did use it, is clear. In addition to the above, it is shown, by his annual account, that he had large cash balances in his hands, as administrator, from 1844 to 1855. In 1844, the cash balance was $1294; in 1845, $4514; in 1846, $6196; in 1847, $7010; in 1848, $7233; in 1849, $8827; in 1850, $10,803; in December, 1850, $10,334; and from that time to 1855, it ranged between $10,000 and $12,000. These balances remained in cash, after the payment of all the expenses and disbursements that he claimed, including the expenses in the N. & J. Dick suit.

But in 1849, we find him refusing to settle with Mrs. Stokes, and demanding money from her, on the ground that he was scarce of funds, and needed it to help pay the expenses of the N. & J. Dick suit. (See C. E. Penn's deposition.) In November, 1852, he pays lawyers' fees, chargeable on the estate, with accepted bills on New Orleans, payable at four months, with interest, and gives as a reason for so doing, that he has no money. (See Rulf Coffman's deposition.) In 1852 and 1853, he was hard pressed for money to pay the debts of the estate, and had to give his two notes, one for $100, and one for $50, due several months after date, to pay lawyers' fees. These fees to Colonel Nelson were paid in small sums, and not all at the same time, his "peculiar circumstances not permitting the payment of the whole." (See R. Nelson's deposition.) He also paid the fees due Clark in small sums,— $10, $20, and $40,—complaining all the time "that the times were hard, and money scarce." (See Clark's deposition.) His annual accounts show that Messrs. Acee, Cothran and Caldwell were also paid in the same way, by small sums at one time. These facts are entirely inconsistent with the hypothesis that he had the money

on hand. But, if he did have the money, and always kept it, it was in his power to have proven the fact. If he deposited it with any banker, he could have proven it by him; but this was an effectual mode of removing all doubt on this subject. If he had the money really in hand, it could easily have been produced, and it was his duty to have done so. 3 J. J. Marsh. 68; 7 Dana, 201. It being peculiarly within his power to have proven the fact, if it really existed, the presumption of law is that it did not exist.

It is attempted now to explain his payment to Burwell and Guion in bills on time, with interest, upon the ground that he was merely complying with the request of Burwell, contained in his letter to him; but this will not do for Guion's payment, and it is a different reason from the one given to Coffman. Besides, Burwell did not write for a time bill, and a sight bill might easily have been procured at Grenada.

Again: there was no reasonable excuse for his failure to make distribution, and he is, for that cause, liable to pay interest. The history of N. & J. Dick's case is given in one of his answers, but it is not sustained by proof. Besides, the fact of litigation, without showing how it would probably terminate, is no excuse for not making distribution. See *Keith & Vaiden* v. *Jolly*, 5 Cush. 131.

Finally, the record presents a clear case of relief for the heirs, on all the points in dispute. The administrator was appointed in 1842. He has had the estate in his hands for sixteen long years, without paying the heirs one dollar. He has refused to settle with and pay them, without legal compulsion, upon the pretext, that the estate was needed to pay the expenses of the Dick law suit. When he is sued, he throws every obstacle in the way of distribution, resorts to technical quibbles to defeat the just claims of the heirs, appeals to this court, and thus hopes to weary them into a compliance with his unjust demands.

HANDY, J., delivered the opinion of the court.

This case comes up by appeal from the Court of Probates of Carroll county. The record is very voluminous and confused, and appears to be conceded not to contain all the proceedings which were had in the cause; but the facts necessary to be taken into view, in determining the points in controversy between the parties, appear to be as follows:—

In September, 1853, the appellees, as distributees of James B. Crowder, deceased, filed a petition in that court against Green Crowder, the administrator, and Mary J. Stokes, the widow, and certain other distributees, of the deceased, stating that Green Crowder had been administrator of the estate, consisting of a large real and personal estate, since the year 1842, and that no distribution had been made; tendering a refunding bond, according to the statute, and praying for distribution to the petitioners of their shares of the personal estate. The administrator answered, admitting assets in his hands, and that no distribution had been made, except to Mary J. Stokes, the widow, who had received one-half of the lands and slaves, the deceased having left no children; that no other distribution had been made, because a suit for about the sum of $15,000 had been for a long time pending and in litigation, upon a claim of N. & J. Dick & Co. against the estate; and that the estate had been involved in other suits; that no distribution had been previously demanded, and no refunding bond tendered; but expressing his willingness to make a distribution, as soon as he could have a fair settlement. He gives a statement of the slaves in his hands, as administrator, and of those distributed to the widow, stating that among the latter were a slave Agga and her two children, born since that division; and that, subsequently to that division, he had purchased the slave from the widow. The answer of the widow sets up that her dower in the lands was allotted to her in the year 1842, and in the slaves in 1844, by a valid decree, which she relies upon as a bar. This decree, though tendered as an exhibit to the answer, is not filed with it.

An amended petition was then filed by the appellees, seeking to set aside the division made to the widow, upon various grounds: that the petitioners were not parties to it, and had no notice of it; that the slaves were not set apart to her by the commissioners appointed to divide the real estate, but by others, appointed without notice, and who did not act under oath; that the division was unequal and unjust to the petitioners, because the slaves allotted to the widow were more valuable than the residue; and that it is void, for uncertainty, in not specifying the slaves set apart. The answer of Green Crowder admitted the want of notice to the heirs, of the division; that the division was made by commissioners, appointed,

as alleged in the petition, and that it was unequal; but that he objected to its inequality in the court, but his objection was overruled. He also admits that five slaves were allotted to the widow, in lieu of certain slaves given by the intestate to his mother in his lifetime.

The answer of the widow denies the most of the allegations of the amended petition : denying the necessity of notice to the petitioners, in allotting her share of the estate; alleging that in making the division, the commissioners considered the slaves alleged to have been given by the intestate to his mother, as still the property of the estate, and gave to the widow slaves equivalent to them, to make up her half of the estate.

Previous to the filing of this amended petition and the answers thereto, and at December term, 1853, Green Crowder filed his petition, alleging that errors and mistakes had occurred in the annual accounts returned by him, and asking permission to correct them; and at February term, 1854, he filed another petition, specifying the several errors and mistakes which he desired to be corrected. After the filing of these petitions of Green Crowder, and at the February term, 1854, the court made an order, appointing A. M. Nelson a commissioner, to ascertain and report to the next term, the exact amount remaining in the hands of the administrator, subject to distribution; and at the March term, 1854, Nelson made his report, to which exceptions were filed, but they do not appear to have been disposed of.

At the same March term, Nelson was appointed a commissioner to ascertain the distributive share of the widow, Mrs. Stokes; but the record contains no report made by him upon that subject.

In this condition of the cause, it appears to have been submitted, at March term, 1854; at which term an interlocutory decree was made, in effect confirming to Mrs. Stokes the slaves previously allotted to her, except Agga and her children, and appointing commissioners to set apart to the petitioners their shares of the residue of the slaves in Crowder's hands, including Agga and her children, which were held to belong to the estate, and to be subject to distribution to the heirs; and, by consent of parties, the commissioner was directed to inquire into and report the value of the hire of Agga and her children, from January 1st, 1844, the date of the

division to Mrs. Stokes. It was also ordered that, after the commissioners should have set apart the shares of the petitioners in the slaves, Green Crowder should deliver them up accordingly. The decree further states that, as to the money and *choses in action* on hand belonging to the estate, the court was not informed as to the amount in the hands of the administrator, the accounts of the administrator having been referred, at his instance, to a commissioner, whose report had not been made and confirmed; and it proceeds to declare, that the petitioners are entitled to a certain specified proportion of the money and *choses in action*, accruing from the hire of the negroes and the rent of the land, and from all other sources, and appoints a commissioner, (Nelson) to ascertain the amount of the distributive shares of the petitioners in these moneys and *choses in action*. It was also ordered, by consent of the petitioners and of Green Crowder, that notice should be given to them of the time and place of taking the account, and that all errors, either for or against Crowder, should be inquired into and corrected before the commissioner, as fully as if a bill of review had been filed.

Afterwards, W. B. Helm and J. Somerville were appointed joint commissioners, though appointed at different times, in the place of Nelson; and the appointment of Somerville, is stated in the record, to have been by the consent of parties.

At February term, 1855, Helm and Somerville made their report, stating an account of the indebtedness of the administrator. To this, exceptions were filed by Crowder, and also by Mrs. Stokes. Those of the latter were overruled and disallowed; those of Crowder were in part disallowed; but some of them were allowed, and, by the direction of the court, the commissioners restated the account, allowing to Crowder certain items of credit which had been rejected by them in the original stating of the account: and upon this account, thus restated, a final decree was made, directing Crowder to pay certain sums to the petitioners.

From the action of the court, in disallowing the exceptions and in rendering the final decree, both Crowder and Mrs. Stokes have prosecuted this appeal.

We will first consider the grounds of error complained of on the part of Green Crowder.

The first objection urged against the proceedings and decrees,

both interlocutory and final, is, that this being an application for distribution before a final settlement of the administrator's account, it was not competent for the court to require a settlement of the administrator's entire accounts; that upon such an application, all that the court can do is, to make a rule upon the administrator, to distribute the assets in his hands, as they appear by his returns and accounts rendered to the court; and further than that, that it was not competent for the court, in such a proceeding, to ascertain the entire amount for which he was accountable to the distributees.

The statute authorizing such a proceeding is very general in its terms. It provides that any one entitled to distribution may, at any time after the expiration of twelve months from the granting of administration, petition to the court, setting forth his claim, whereupon the court shall "grant a rule on the administrator to make distribution agreeably to law," the distributee giving bond and security, to refund a due proportion of any debts or demands which may afterwards appear against the estate, and costs incident thereto. Hutch. Dig. 665, § 91.

The object of the statute manifestly appears to be, to enable a person entitled to distribution, to obtain the share of the estate to which he may be entitled. He is required to set forth his claim, and of course to establish it. But what claim? Clearly his claim upon the entire assets of the estate, which have come to the hands of the administrator, and for which he is accountable to those entitled to the estate. No mode of ascertaining the amount for which the administrator may be liable, nor the share to which the person asking distribution may be entitled, is prescribed, and none was necessary to be provided. That was left to the general powers of the court, which were ample, and required no further provisions for the attainment of the end intended by the statute. It is made the duty of the court, to "*grant a rule* on the administrator to make the distribution *agreeably to law*." If the administrator has returned no account, it will scarcely be contended that the court has not power to compel him to render an account, to examine and try its correctness, to allow or disallow it, either wholly or in part, and to determine his accountability. Such a course is clearly contemplated by the statute; for it is not to be supposed, that a rule should be granted upon the administrator to make the distribution, unless the

amount to be distributed was judicially ascertained. The terms, "*grant a rule* to make the distribution," imply that the funds sub-ject to distribution, as well as ·the portions of the persons entitled thereto, have been previously ascertained and fixed. Such ques-tions, of course, are not to be determined by the administrator; but must be settled by the court, to which the general duty of directing the administration is committed by law.

But suppose that the administrator has rendered erroneous and imperfect accounts, has not the court, in ordering the distribution, the power to correct his accounts upon proper proof, and to deter-mine the true amount of his accountability? It is clear that it has. The court is required to order *distribution* to be made "*agreeably to law.*" Distribution of what? Certainly *of the estate* in the hands of the administrator, and for which he is accountable at the time he may be required to make the distribution, and to the distributees, according to their "claims" or interests in the estate, for which the administrator is accountable. This distribution is to be made "agreeably to law;" that is, upon an ascertainment, by the court, of the assets in the hands· of the administrator, for which he is accountable, and of the share, or shares thereof, to which the dis-tributees are entitled. It would be contrary to all principle to sup-pose, that these questions are to be settled by the administrator; and it is clear that they must be determined by the court, whenever a controversy in relation to them may arise, in the matter of the application for distribution. The power to require an account, ap-pears plainly to be an incident to the jurisdiction to order distribu-tion; and that power might be entirely ineffectual, or imperfect, unless it was competent for the court, *to investigate* and consider all the acts of the administrator, showing for what assets he was accountable, and what property or money was in his hands, to be distributed to the parties entitled.

There appears to be nothing in the statute sanctioning the idea, that the distribution intended should be only a partial one. On the contrary, the language appears clearly to contemplate a distribu-tion to the petitioner, of the share of the whole estate to which he may be entitled. It is, that the court shall grant a rule to make *the distribution according to law.* This language will not bear the construction, that the petitioner was to receive merely a part of his

share of the estate, or that any basis of distribution was to be acted upon, but the ascertainment of the entire assets for which the administrator was then accountable.  The distribution contemplated appears to be, in effect, a final settlement, as between the distributee and the administrator, of all assets for which the administrator is then accountable; and this appears to be plain from the provision, that the distributee should give a bond and security, to refund his proportion of debts, which might subsequently be established against the estate.  If there were no subsequent debts paid, and no further assets came to the administrator's hands, the account taken upon the application for distribution, would render any further accounting unnecessary, and be, in effect, a final settlement of the estate, so far as the party receiving his distributive share of the estate was concerned.  If further debts were established and paid, the refunding bond is the resource to the administrator, provided by the statute, as a security for parting with the assets in his hands.  There is, therefore, no inconvenience in treating the account and distribution made under this statute, as virtually a final settlement, so far as the administrator is then accountable; and it appears to have been intended by the statute to have that effect. This objection appears, therefore, to be untenable.

But it is again insisted, that though it might have been proper for the court to examine the accounts of the administrator previously rendered, if they had been called in question by the petition, yet that it was not proper to do so under the pleadings in this case, which alleged no acts of mal-administration, and made no charges of errors or omissions in his accounts.

It would be a sufficient answer to this objection, that the statute does not contemplate or require the proceeding by which the administrator's accountability is to be ascertained, to be conducted according to strict rules of pleading.  In case of controversy as to the amount for which the administrator should account, it would be the duty of the court to require an account, upon the same principles upon which a final account is taken, the object in both cases being to ascertain the true amount with which the administrator is chargeable; and no formality of pleading is necessary in taking such an account.

But the appellant is precluded of any objection on this ground,

because the first suggestion of errors and mistakes in his accounts came from him, by his petitions at December term, 1853, and February term, 1854, praying that they should be investigated and corrected; and accordingly, in the interlocutory decree, at March term, 1854, it was ordered, by his consent, that all errors for or against him in his accounts, should be inquired into and corrected by the commissioner, as if subjected to examination by bill of review. This, while it is a conclusive answer to this objection, goes far to destroy any force that might be in the objection first considered, inasmuch as it shows that the re-examination of his accounts, and the new account made thereupon, was done at his instance and by his consent.

Again, it is objected that the appointment of the commissioners to take the account of the administrator, by the decree at March term, 1854, was void for want of authority; that their report and statement of the account were made without authority, and are insufficient to sustain the decree rendered thereupon upon the final hearing.

The statute gives to the Court of Probates, in case exception shall be made in court to any account of an administrator, power to refer the same to auditors, who shall examine and restate the account after hearing testimony, and report it for allowance. Hutch. 663, sec. 87. Without this statute the court had general jurisdiction of the matter of the accounts of administrators, and this statute is but directory as to the exercise of that jurisdiction, pointing out one mode in which it may be exercised, in case exception be taken to the administrator's account as rendered by him. The court being vested with general jurisdiction of the subject-matter, it was competent for the parties in interest to waive a compliance with the form mentioned in the statute, and to agree that the matter of examining and stating the account of the administrator, should be referred to auditors or commissioners. It appears by the interlocutory decree at March term, 1854, that this reference was made by the consent of the appellant, and it also appears that the reference of the same matter to the commissioner Nelson, at February term, 1854, was made upon his petition and at his instance. This is clearly a waiver on his part, of the particular form and circumstances mentioned in the statute, as authorizing the

reference of the matter of taking and stating his account, and justifies the appointment, under the general jurisdiction of the court over the subject-matter.

It is also objected, that the interlocutory decree referred the matter of taking and stating the account to the commissioners, without fixing the principles upon which they should proceed, submitting all questions of law and of fact to them. The statute, authorizing the reference, does not require that directions be given, as to the principles upon which the account is to be taken and stated; and it appears that the whole matter shall be submitted to the commissioners, " to examine and restate the account after hearing parties and witnesses, and to make report" to the court, for its revision. By the terms of the decree, the account to be taken and reported, was subject to the action of the court. But, in addition to this, the power to examine and restate the account, in the general terms in which it was conferred upon the commissioners, appears to have been given by the express consent of the appellant. The taking of the account, and the evidence upon which it was founded was merely a ministerial act, done in order to aid the court in ascertaining the facts in relation to the matter; and it was competent for the parties to consent to a particular mode of ascertaining the facts, the essential judicial act remaining to be performed by the court, in its action upon the account, and report when returned by the commissioners.

The next ground of error insisted upon is, that the administrator was charged in the account, and by the final decree, with the rents of lands of the intestate, and that the interlocutory decree was erroneous in directing him to be charged with these funds. It is denied that the Probate Court had jurisdiction to charge him for rents, that not being a matter pertaining to the administration, and he being responsible to the heirs alone on that account.

It appears by the record, that he had voluntarily charged himself, in his annual accounts, with moneys received by him for the rent of the lands, and had received credits in those accounts, for moneys disbursed in the payment of debts, to an amount greatly exceeding the rents with which he is charged. Those accounts were passed and allowed, and were for the most part adopted, as to the credits allowed the administrator, in the account stated by the commis-

sioners. Afterwards he filed in this cause, a petition specifying the errors in his annual accounts, which he desired to be corrected, but did not object to the charges which he had made against himself for rents. Under these circumstances, these charges were taken as correct, and were recognized as such in the interlocutory decree, and carried into the account of the commissioners ; and the administrator took no exception thereto in the court below.

It is true, as a general rule, that an administrator has no control or authority over the freehold estate of his intestate. Yet it is subject to the payment of the debts before the actual appropriation of it to that purpose ; and it is competent for the heir to waive his right in it, and a compliance with the conditions prescribed by law for the regular exercise of the power of the administrator over it, and to consent to his acts appropriating it to the payment of the intestate's debts. *Lee* v. *Gardiner*, 26 Miss. R. 521 ; *Kempe* v. *Pintard*, 32 Ib. 324. After the administrator has received the rents, and accounted for them to the Probate Court as assets of the estate, he will be precluded from alleging that he received the rents without authority, and must be chargeable with them as for assets rightfully received ; and especially will this be the case when, as in this case, his accounts show that he has paid an amount equal to the rents received by him, in discharge of the debts of the intestate. His own voluntary accounting must be conclusive against him as to his authority to do the act, and he cannot be permitted in a subsequent accounting, to re-open his own accounts, and to deny his right to receive funds with which he had charged himself. *Satterwhite* v. *Littlefield*, 13 S. & M. 302. The court had jurisdiction to receive and pass upon his accounts, and if he thought fit to charge himself with funds connected with the estate, and which he had actually received, it would be contrary to the plainest principles of justice to permit him, on technical grounds, to deny his authority to receive the funds, and to claim to correct accounts already passed, on the allegation of his own wrong, thereby in all probability causing a loss of the amount to the heir, and retaining it to his own use, by the operation of the Statute of Limitations. We, therefore, think that the administrator was properly charged for the rents in this case.

Another ground of objection is, that the administrator was

charged with interest in the account — with simple interest upon sums illegally disbursed by him, and with compound interest upon cash balances appearing, by his accounts rendered, to have been in his hands.

The allowance of simple interest upon sums illegally paid out, does not appear to be contested here; but it is insisted that the allowance of compound interest is not sustained by law, nor warranted by the evidence in the cause.

The rule appears to be well established, that if a trustee apply the trust funds in his hands to his own benefit, the *cestui que trust* is entitled to the profits; because the trustee is not permitted to speculate and make a profit upon the funds in his hands. *Schieffelin* v. *Stewart*, 1 John. Ch. Rep. 620; *Ringgold* v. *Ringgold*, 1 Harr. & Gill, 11–80; *Harland's Accounts*, 5 Rawle, 323. And the *cestui que trust* is entitled to elect to take the profits, or the principal with compound interest. 2 Kent's Comm. 230 (8th edit.). This rule has been sanctioned by this court: *Gully* v. *Dunlap*, 24 Miss. 410; and though apparently harsh, it is salutary in its operation, in tending to keep trustees to the faithful performance of trusts reposed in them, in which parties are mostly concerned who are incompetent to protect their own interests, and the trustees have often great temptations to abuse their powers. It is founded on the principle, that the *cestui que trust* is entitled to the profits made by the trustee by the use of the trust funds; and where the trustee has made, or there is ground to infer that he had made, a profit, and the amount of it is not shown, the general rule has been adopted of allowing compound interest, as the measure of the profit which the trustee will be presumed to have made. *Schieffelin* v. *Stewart; Ringgold* v. *Ringgold.*

In examining the evidence set out in the record, upon the point of the use of the funds of the estate by the administrator, it appears, from his annual accounts rendered, that from the year 1844 to the year 1855, he had in his hands, after all disbursements, in each year, a sum varying from about $1300 to about $12,000.

Notwithstanding the large assets in his hands, in the spring of 1849 he refused the application of Mrs. Stokes for distribution and settlement, and demanded money of her to assist in paying the expenses of the suit of Dick & Co., saying that he greatly needed

money for that purpose. In November, 1852, he drew two bills to pay attorneys' fees, and had them accepted, stating that he had not the money to pay the fees, and therefore had to draw bills on time, bearing interest, and to be met with cotton. He complained to Williamson that he was much troubled to pay the expenses of the suit of Dick, and that Mrs. Stokes would not assist him. He was hard pressed for money to pay the expenses of that suit, and had to give Nelson his note on time for his fee in 1852 and 1853. He paid the fees of Clark in small sums of $10, $20, or $40, stating as a reason, that times were hard, and money scarce.

This conduct is irreconcilable with his having on hand the large sums of money with which he was chargeable, and which greatly exceeded any sums paid by him for expenses upon the suit of Dick, added to the sums for which he gave his notes and bills.

It further appears, by the testimony, that, during the period of his administration, he has traded largely in lands; that he has made an "immense property," and has been an active trader; that he works forty-five or fifty slaves, and owns in all eighty-five or ninety, and has a large number of horses and cattle. The number of his slaves, about 1841, appears to have been twenty-five ·or thirty, and his crops of cotton appear to have averaged about seventy-five or one hundred bales about that time. His real estate appears to be very large. The testimony further tends to show that he has not been a successful planter.

This evidence we think sufficient to warrant the conclusion of the commissioners, and of the court below, that the administrator did not keep on hand the money with which he was chargeable. His avowed inability to pay the inconsiderable amounts required to pay fees, because he had not the money, is entirely inconsistent with his having the money on hand. He does not show that he used it in the legal course of his duty, and he has failed to show how it was used. It is not incumbent on the distributees to show how it was used, though the circumstances might justify the belief that it was used in trading, and for his own benefit, and by which he was, in part, enabled to acquire his large estate. It is only necessary to show that he did not keep the money on hand; and the presumption arises, upon his failure to show a proper use of it, that he applied it to his own use and benefit; and under such circumstances he was properly charged with compound interest.

The next objection insisted upon, is the disallowance of certain items of credit claimed by the administrator, mainly for fees paid to lawyers on account of the suit of Dick & Co.

It appears that that suit was litigated for several years in the Circuit Court, and in this court; that, besides the counsel whose fees were disallowed, the administrator retained Mr. Acee, and Messrs. Cothron and Caldwell, and Mrs. Stokes retained Mr. Sheppard; that these gentlemen attended to the case in the Circuit Court, and were fully competent to defend the interest of the estate, in that court, without the aid of other counsel; that they were also ready and competent to attend to the case in this court, but as it was one of great importance, and for a large amount, and some of the counsel retained by the administrator could not attend this court to argue the case, it was deemed advisable to employ additional counsel in this court.   It appears that the fees of the above-named counsel in the Circuit Court were allowed; but as the evidence is clear that the other counsel employed in that court were supernumerary, we think the fees paid such counsel by the administrator were properly rejected.

In addition to the three counsel already retained to attend to the case in this court, and whose fees were allowed, it appears that three others were employed, and that the fee paid one of them was allowed, and the others rejected.   The evidence shows that the counsel originally retained were attending to the case in this court, and were fully competent to do justice to it, but that one of them was unable to attend and argue the case at the bar, the other being always prepared to do so.   These circumstances, and the importance of the case, we think, justified the administrator in retaining one of the counsel engaged by him in this court; but from the evidence, the employment of the others was useless, and, therefore, the action of the court upon this point was correct.

As to the disallowance of the fees paid in the suits against Mrs. Stokes, it appears that the fee paid one counsel was allowed; and there appears to have been no necessity for the employment of additional counsel, as the cases were not litigated.   The claim on this account was, therefore, properly rejected.

The last objection insisted upon is, that the administrator was decreed to make distribution of the woman Agga and her children,

as property of the estate undistributed, and to account for their hire.

The ground of this objection is, that it appears, by the answer of Mrs. Stokes to the amended petition of the appellees, that the slave Agga had been distributed and set apart to her, and was afterwards sold by her to Crowder, who thereby became entitled to her in his individual right.

While it is true that the title to this slave is thus alleged to have been vested in Mrs. Stokes, by the division made by certain commissioners appointed for that purpose, yet that division was alleged to be illegal and irregular in many respects, and its validity was directly brought in question in this cause. In addition to the fact that its irregularity is admitted by the answer of Crowder to the amended petition, and is substantially admitted by the answer of Mrs. Stokes, it appears that the interlocutory decree, made at March term, 1854, upon the submission of the question to the court, holds the division and allotment, as to the slave Agga, to be invalid; and as the record contains none of the evidence upon which that decree was based, it must be presumed to be correct. *Smith* v. *Hurd*, 8 S. & M. 682. So far as the record shows, it does not appear that the division relied on, to the widow, had ever been confirmed by the court; and for aught that appears, it was entirely competent for the court to reject it, and to direct the division recognized in the interlocutory decree of March, 1854; and it is distinctly stated in that decree, that Crowder admitted that the slaves allotted, in the first division, to the widow, were of greater value than she was entitled to. These circumstances add force to the presumption of the correctness of the interlocutory decree.

But moreover, Crowder fully recognizes the correctness of the decree holding the slave Agga and her children to be the property of the estate, and subject to distribution. The decree states that, by consent of parties, the commissioners were to inquire into and report the value of their hire, since the alleged division to Mrs. Stokes; and no exception was taken to the report of the commissioners on this ground.

There appears, therefore, to be no valid ground to support this objection.

It is, however, said that the appellant is charged with the sum

of $300, received by him from Mrs. Stokes, on account of the slave Agga, that sum being the excess received by her over her share, including Agga in the slaves allotted to her. But it appears, by the commissioners' account, that he is credited by that sum, which had been charged against him, because the slave had been adjudged to the heirs, and surrendered by him.

Having thus disposed of the several objections urged in behalf of Crowder, and being of opinion that there is nothing therein to justify a reversal of the decree, we proceed to notice the objections taken in behalf of Mrs. Stokes.

The first objection is, that the administrator is allowed, in the account, full commissions upon the assets which came to his hands, and for which he was held accountable, and was charged, although the settlement was not a final one. This objection is already disposed of, in what has been said above upon the objections of the administrator; in which it is held that this distribution was, as to the assets accounted for, in effect a final settlement; and, of course, it was proper that the administrator, in making the same, and in surrendering all the assets in his hands, should receive the compensation to which he was entitled, so far as he had administered the estate.

The next objection is, that one-half of the commissions were required to be paid by Mrs. Stokes, or charged against her; whereas a considerable amount of the assets upon which the administrator's commissions were allowed, came to his hands after she had received her portion of the estate, and that she was not chargeable with commissions on those assets.

This objection was not made a ground of exception to the report of the commissioners, nor does it appear to have been a matter of controversy in the court below. The facts bearing upon it do not appear, therefore, fully, by the record. Under such circumstances, it is not the proper subject for consideration in this court, and it cannot be properly determined upon this record.

Another objection urged is, that the commissioners remodelled their report after it was made, without authority or further evidence.

It appears, that upon the return of the report to the court, certain exceptions were filed to it, some of which were sustained, and

the commissioners were directed to restate the account accordingly; and it was done, and afterwards it was confirmed by the court. There was certainly nothing improper in this. The decision upon the exceptions was the judicial act of the court, and the restatement of the account was but a ministerial act, which it was competent for the court to order to be done, and, when confirmed, it had the full authority of a judicial act.

Again : it is objected that the court erred in allowing certain items to the administrator, which had been rejected by the commissioners and were disallowed in their report. These items consist chiefly of fees of counsel paid on account of the suit of Dick, which have been already considered, upon the objections of the administrator. For the reasons there stated, we consider this allowance just and proper, and the exception on this ground was properly overruled.

Another objection insisted upon is, the allowance to the administrator for money paid by him, on a claim of one Brown, against the estate, founded upon receipts given by the intestate, for certain claims received by the intestate from Brown for collection. It appears that the account of Brown, setting forth his claim, had been allowed by the judge of Probates, on the 22d July, 1842, and that at December term, 1842, the administrator's account, claiming allowance for the payment of the claim, is stated to have been "*examined and fairly stated ;*" and, under these circumstances, he was allowed credit by the commissioners' account for the payment of the claim. When the objection to the allowance of the claim came up for consideration in the court below, Mrs. Stokes called the administrator as a witness, to testify to certain facts connected with the claim, and tending to show its invalidity; and having failed in the desired proof, the administrator was then examined as to certain facts tending to show its validity, the exceptant objecting to his competency as a witness.

It is, first, objected that the allowance of the claim of Brown, by the judge of Probates, on the 22d July, 1842, was insufficient to warrant the administrator in paying it, because such allowance could only be made by the court, and the date of it shows that it was not done at a time when the court could be held. But though not allowed at a regular term, it might have been done at a special

McGuire *v.* The State of Mississippi.

term, and every presumption must be indulged in favor of the act of the judge, and that it was properly done; and this was sufficient to justify the administrator in paying it, if he acted in good faith. It is immaterial, therefore, whether his account of December, 1842, in which it was charged, was formally and regularly passed and allowed or not. But though the order of allowance of his account is not formal, yet the matters of the account were carried into those subsequently and duly allowed, which would be sufficient to cure the informality, and to show that in fact it was allowed by the court. Under these circumstances the administrator was clearly entitled to have credit for the amount, in the account stated by the commissioners. And, therefore, it was immaterial whether the examination of the administrator in his own behalf was proper or not; for the claim was entitled to allowance without his testimony. But it is evident that he was competent under the circumstances to show the validity of the claim. He had been introduced and examined, by the exceptant, as a witness to a point tending to show that the claim was not valid; and he was, therefore, a competent witness in his own behalf to testify to facts connected with the same point and showing its validity.

These being the grounds of objection urged in behalf of this appellant, we think that they show no good ground for reversal of the decree.

And, upon consideration of the whole case, the decree must be affirmed.